**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | Misc. No. |
| | ) | |
| | ) | **UNDER SEAL** |
| **1401 S Street, N.W., Apt 214** | ) | |
| **Washington, D.C.** | ) | |
| _____ | ) | |

**AFFIDAVIT**

I, Jonathon Price, Special Agent of the Drug Enforcement Administration ("DEA"),
Washington Division Office ("WDO"), Washington, DC, being duly sworn, depose and state the
following:

**I.    BACKGROUND AND EXPERIENCE**

1.    I am an investigative or law enforcement officer of the United States within the
meaning of Title 18, United States Code Section, 2510(7), that is, an officer of the United States
who is empowered by law to conduct investigations of and to make arrests for the offenses
enumerated in Section 2515 of Title 18, United States Code.

2.    I have been a Special Agent ("SA") with the DEA since 2005. I am currently
assigned to Enforcement Group Forty-four at the Washington Division Office, located in the
District of Columbia.  While with the DEA, I have investigated, and assisted in the investigation
of many narcotics traffickers and possessors.  I have previously participated in investigations
which have led to the arrest and conviction of narcotics dealers and money launderers.

3.    Since 2005, I have received training and experience in interviewing and
interrogation techniques, arrest procedures, search warrant applications, surveillance, undercover
operations, operations involving cooperating sources, and a variety of other investigative tools
available to law enforcement officers.  In the course of my training and experience, I have
become familiar with the methods and techniques associated with the distribution of narcotics,

the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies.  In the course of conducting these investigations, I have been involved in the use of the following investigative techniques, among others: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and drug related assets; and analysis of financial documents and records.

4.      In addition, I have received training and gained practical experience in the identification of narcotics paraphernalia.  Through the course of this and other related investigations, I have come to know the methods by which methamphetamine is consumed by habitual abusers.  Methamphetamine is largely consumed by users in one of several ways: intravenously or "pointing;" nasal inhalation or "bumping;" absorption as a suppository, referred to as "booty-bumping;" smoking the heated vapors; and, less commonly, consumed orally, which is referred to as "parachuting."

5.      All information contained in this affidavit, from whatever source derived, is either personally known to me or has been related to me by other sworn law enforcement personnel. This affidavit is not intended to include each and every fact and matter observed by me or known to the government.  Moreover, to the extent that this affidavit contains statements by witnesses or confidential sources, those statements are set forth only in part and in substance and are intended to accurately convey the information, but not to be verbatim recitations.  Furthermore, any

statements excerpted from transcripts of recorded conversations, including those that are quoted, are derived from draft transcripts that are subject to further revision.

6.     As described in greater detail below, the investigation has revealed that **Ronald WARREN ("WARREN")**, **John Francis Lacey III ("LACEY")**, **Stephen Todd ALLEN ("ALLEN")**, **Gregory HAMILTON** ("**HAMILTON**") (collectively, "Target Subjects") and others are participating in a conspiracy to distribute and possess with intent to distribute controlled substances and that the fruits, evidence, and instrumentalities of violations of the following federal offenses, among others, are likely presently to be found at the address for which authority to search is sought herein:   (i) possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); and conspiracy to commit such offenses, in violation of 21 U.S.C. § 846; and (ii) use of communications facilities to facilitate the commission of the above offenses involving controlled substances, in violation of 21 U.S.C. § 843(b) (collectively, the "Target Offenses").   Specifically, there is probable cause to believe that within the confines of the Target Location there exists evidence and instrumentalities of the Target Offenses, as set forth more fully in the Attachment A, incorporated herein by reference. The target location is as follows: this affidavit is submitted in support of a search warrant for 1401 S Street, N.W., Apt 214, Washington, D.C. ("TARGET LOCATION").   As explained in further detail, this is the residence of **Gregory HAMILTON.**  As further explained herein, **HAMILTON** is involved in the acquisition and distribution of methamphetamine and that he uses the TARGET LOCATION as a location to facilitate his narcotic trafficking activity.

7.      Based on my training, experience and participation in narcotics investigations and the training and experience of other agents and detectives with whom I am working closely in this investigation, I know that:

a.      Drug traffickers commonly maintain at their residences and on their property additional quantities of the illicit drugs being distributed.  These drugs may be concealed in locations known to the traffickers to avoid law enforcement detection.  Drug traffickers also commonly maintain at their residences and on their property paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances.

b.      Drug traffickers commonly maintain at their residences and on their property, books, records, receipts, computer diskettes, mobile data storage units, computers, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, purchase, packaging, sale, and distribution of controlled substances.

c.      Drug traffickers commonly maintain in their residences and on their property, books, papers, owe sheets, and documents which reflect the names, addresses, and telephone numbers of their suppliers, couriers, customers, and other associates in the illegal drug trade.  Drug traffickers keep these items in secure locations within their residences and their property, so they have ready access to such information.

d.      Drug traffickers attempt to legitimize the proceeds from the sale of controlled substances.  Books and papers relating to such efforts, including but not limited to, cashier checks, money orders, and ledgers are maintained in the residences and on the property of the drug trafficker.

e. Drug traffickers routinely conceal in their residence or the residences of friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house, large quantities of currency, financial instruments, precious metals, jewelry and other items of value, typically proceeds of illegal controlled substance transactions.

f. Drug traffickers take, or cause to be taken, photographs of themselves, their associates in the drug trade, property derived from the distribution of narcotics, and their products, and that such photographs are often kept in their residences.

g. Drug traffickers very often place assets, including real and personal property, such as vehicles, in names other than their own to avoid the detection and forfeiture of such assets by government agencies and continue to use these assets and to exercise dominion and control over them even though the assets are not normally owned by them.

h. Drug traffickers commonly communicate via cellular telephone to facilitate drug transactions. These communications include cellular contact, text messaging, direct connect and instant messaging as well stored information to include but not limited to photographs, videos, address lists, phone numbers, day planners, etc.

8. The following information is submitted for the purpose of establishing probable cause that the Target Subjects and others are involved in narcotics distribution, and that the **TARGET LOCATION**, more fully described herein, contains and will contain evidence, fruits and instrumentalities (see Attachment A), related to the Target Offenses.

## PROBABLE CAUSE

A.    **Background of the Investigation**

9.    Beginning in or about February 2013, a reliable confidential source, hereinafter referred to as CS #1, reported to your affiant and other special agents that **Ronald WARREN** is involved in the distribution of methamphetamine.  CS #1 reported that he/she had known that **WARREN** had access to a source of supply for methamphetamine in Atlanta, Georgia, with whom **WARREN** routinely meets and purchases quantities of methamphetamine.  A review of cell tower records for Target Telephone #1[1] showed **WARREN** made at least eight trips to Atlanta between July 12, 2013 and September 30, 2013.

10.    CS #1 advised special agents that **WARREN** drives down to Atlanta, Georgia approximately once a month to pick up methamphetamine.  Additionally, CS #1 stated that **WARREN** has surveillance cameras outside his residence and keeps methamphetamine in a cabinet in the back of his house.  CS #1 stated that **WARREN** currently sells eight balls (approximately 3.5 ounces) of methamphetamine for $600 and knows **WARREN** to supply "Jay LACEY," known to your affiant as John Francis **LACEY**.  Your affiant, in addition to other special agents, has confirmed the presence of surveillance cameras mounted outside **WARREN**'s residence at 6179 Red Fox Place, Waldorf, Maryland.  Additionally, your affiant has also confirmed the presence of surveillance cameras mounted outside **LACEY**'s residence at 5016 Nicholas Drive, Waldorf, Maryland.  Based on your affiant's training and experience, your affiant knows that narcotics distributors use surveillance equipment to monitor people in the immediate vicinity of their homes and/or stash houses, for secure their narcotics, and proceeds

---

1 Numerous wire interceptions were obtained in this investigation; information regarding the target telephones begins at paragraph 15.

from the distribution of narcotics.

11.      In July 2013, special agents met with CS #2, a reliable confidential source, regarding **WARREN**'s methamphetamine distribution in Waldorf, Maryland.   CS #2 has observed **WARREN** and his wife use methamphetamine on multiple occasions at their residence in Waldorf, Maryland.   According to CS #2, **WARREN** rents a rental car and drives down to Georgia once a month to purchase quantities of methamphetamine. CS #2 has observed **WARREN** driving rental cars and **WARREN**'s sons told CS #2 that **WARREN** was going to Georgia to pick up packages. Upon returning from trips to Georgia, CS #2 has observed **WARREN** carrying a large cardboard box from the rental car into his residence.   On one occasion, CS #2 observed a cardboard box containing a quantity of methamphetamine about the size of a house brick, which was wrapped in a plastic bag with shrinkage on the sides, resembling food saver packaging in **WARREN**'s bedroom.   Additionally, CS #2 stated that **WARREN** has multiple visitors at the house in the early morning hours before sunrise, for which CS #2 believes are visiting **WARREN** to obtain methamphetamine.

12.      In early September 2013, without knowledge or consent from your affiant or other special agents, CS #1 met with **WARREN** at his residence on Red Fox Place in Waldorf, Maryland.   During that meeting, CS #1 purchased a 1/4 of a gram of methamphetamine for $60. A second time in early September 2013, without knowledge or consent from your affiant or other special agents, CS #1 arranged to meet with **WARREN** at **WARREN**'s residence and purchased 1 gram of methamphetamine for $200.    CS #1 advised that **WARREN** charges $200 for 1 gram and $150 for .75 grams of methamphetamine. CS #1 further stated that **WARREN** sells gamma-hydroxybutyrate (GHB) for $100 dollars per ounce.

13.     The investigation thus far, has revealed that **WARREN** and **LACEY** are operating a methamphetamine distribution and money laundering network in Waldorf, Maryland and the surrounding Virginia/Maryland/Washington D.C. metropolitan area.  Specifically, your affiant has determined that **WARREN** is in contact with drug suppliers, specifically Stephen "Todd" **ALLEN**, and that **WARREN** is transporting money from the Washington D.C. metropolitan area to Georgia, and transporting drugs (methamphetamine and gamma hydroxybutyrate, also known as GHB) from Georgia to the Washington D.C. area.  Based upon intercepted wire and electronic communications, your affiant has identified James **BARFIELD** and Gregory **HAMILTON**, as participants in **WARREN's** drug distribution network.   In addition, your affiant has identified other co-conspirators as assisting with the transportation of the narcotics, the distribution of narcotics and assisting in the laundering of money by making deposits of currency, writing checks and using stored value cards, as well as other narcotics distributors.   Intercepted conversations indicate **WARREN** and **LACEY** are communicating with members of the drug and money laundering conspiracy using the Target Telephone #1, Target Telephone #2, Target Account #1 and Target Account #2, through phone calls, text messaging and iMessaging.  Specifically, intercepted conversations indicate that members of the conspiracy are making phone calls, sending text messages and iMessages; discussing quantities of methamphetamine, quality of methamphetamine, prices of methamphetamine; and arranging for the pickup and delivery of methamphetamine and money.   Additionally, intercepted conversations and text messages indicate that **WARREN** discusses bank account information (account and routing numbers) relating to the funneling of drug proceeds from Maryland to Georgia.

14.     Based on source information and tracking warrant data obtained for **WARREN**'s cellular telephone, the DEA is aware that **WARREN** travels to Atlanta, Georgia, to obtain methamphetamine for redistribution in southern Maryland, Washington, D.C. and Virginia. The frequency of these trips has ranged from monthly (in mid to late 2013) to weekly (currently). For the past six weeks, **WARREN**'s trips have been preceded by and corroborated by wire and electronic communications, wherein there is discussion of quantities of methamphetamine and money for the purchase of methamphetamine. While driving back to Maryland from Atlanta, wire and electronic interceptions of **WARREN**'s cellular telephone, coupled with tracking data, show that **WARREN** is distributing quantities of methamphetamine.

B.     **Title III Wire Interceptions**

15.     Over the course of the investigation law enforcement intercepted wire communications which demonstrate how **WARREN, LACEY** and others are involved in narcotics distribution. On February 21, 2014, the Honorable Paul W. Grimm, U.S. District Court Judge for the District of Maryland, signed an order authorizing the interception of wire and electronic communications to and from **WARREN**'s cellular telephone 301-653-0301 ( "Target Telephone #1) and Apple ID[2]: ron1w@comcast.net ("Target Account #1"); and wire and electronic communications to and from **LACEY**'s cellular telephone 202-285-2954 ( "Target Telephone #2") and Apple ID: jflacey@comcast.net ( "Target Account #2."). These interceptions commenced on February 24, 2014 and ceased on March 26, 2014. On March 31, 2014, the Honorable Paul W. Grimm signed an order authorizing the continued interception of

_____

2 An Apple ID is the email address associated with an Apple device user's iCloud account. An iCloud account allows the device user the option to store items, including messages, photographs, contacts and calendar entries on a remote computer server, and allow other Apple devices access to that information.

wire and electronic communications to and from Target Telephone #1, Target Account #1, Target Telephone #2 and Target Account #2.  Interceptions commenced on the same date and are ongoing and active at the present time.

16.     Furthermore, your affiant believes that there is probable cause to believe that evidence of this drug conspiracy, including but not limited to records, currency, contact lists, communications, and cellular telephones, among other narcotics-related paraphernalia, as further set forth in Attachment A, will be found in the Target Location.

**C.     Warren/Lacey Interceptions**

17.     Between March 2, 2014 and March 5, 2014, **WARREN**, utilizing Target Account #1, exchanged the following iMessages with **HAMILTON** at (202) 460-9800.  (The subscriber of this telephone number, (202) 460-9800, is Gregory **HAMILTON**).

| MESSAGE ID | DATE | TIME | DIRECTION | NUMBER | MESSAGE |
|---|---|---|---|---|---|
| 83236 | 3/2/2014 | 20:19:11 | Outgoing | 202-460-9800 | Hello. |
| 83239 | 3/2/2014 | 20:25:36 | Incoming | 202-460-9800 | Heya, how's it going? |
| 83240 | 3/2/2014 | 20:26:39 | Outgoing | 202-460-9800 | Going wmm.  How about you? Ready for the snow? |
| 83241 | 3/2/2014 | 20:27:44 | Incoming | 202-460-9800 | Going wmm? |
| 83242 | 3/2/2014 | 20:29:38 | Outgoing | 202-460-9800 | I'm thinking I'm going to wait till after the storm |
| 83243 | 3/2/2014 | 20:31:57 | Incoming | 202-460-9800 | That's cool, I'm not happy with the last batch, neither were my people, didn't even go through 1.  Had to get my bud from NY to bring me down one |
| 83244 | 3/2/2014 | 20:32:53 | Outgoing | 202-460-9800 | Really?  I haven't had any issues |
| 83245 | 3/2/2014 | 20:33:55 | Outgoing | 202-460-9800 | I was still going to come by tomorrow.  That is if you want me too |
| 83256 | 3/2/2014 | 20:57:36 | Incoming | 202-460-9800 | I think I'm going to sit this round out. |

| MESSAGE ID | DATE | TIME | DIRECTION | NUMBER | MESSAGE |
|---|---|---|---|---|---|
| 83257 | 3/2/2014 | 20:58:32 | Outgoing | 202-460-9800 | Ok |
| 83258 | 3/2/2014 | 20:59:04 | Outgoing | 202-460-9800 | I'm sorry.  Did you talk to Todd? |
| 83259 | 3/2/2014 | 20:59:44 | Incoming | 202-460-9800 | No, I haven't yet |
| 83260 | 3/2/2014 | 21:01:44 | Outgoing | 202-460-9800 | Ok.  If something should change. It will probably be Tuesday. |
| 83641 | 3/3/2014 | 12:44:07 | Outgoing | 202-460-9800 | Hey there |
| 83642 | 3/3/2014 | 12:46:40 | Outgoing | 202-460-9800 | I have a question for you if you are up and about this snowy day |
| 83714 | 3/3/2014 | 19:28:00 | Outgoing | 202-460-9800 | Are you there? |
| 83723 | 3/4/2014 | 20:17:04 | Incoming | 202-460-9800 | I'm not feeling well today |
| 83724 | 3/4/2014 | 20:18:49 | Outgoing | 202-460-9800 | I'm sorry to keep bugging you.  I just had a question for you.  It's kind of time sensitive. |
| 83728 | 3/4/2014 | 20:21:20 | Incoming | 202-460-9800 | What's up? |
| 83729 | 3/4/2014 | 20:23:09 | Outgoing | 202-460-9800 | I was going to ask if I could take some of the unwanted stuff off your hands. Pay of course. |
| 83734 | 3/4/2014 | 20:27:22 | Outgoing | 202-460-9800 | Otherwise I'll just continue with my plans for leaving tomorrow. Just let me know. Thanks. |
| 83735 | 3/4/2014 | 20:30:55 | Incoming | 202-460-9800 | How much were you thinking? |
| 83737 | 3/4/2014 | 20:31:38 | Outgoing | 202-460-9800 | At least cover your cost |
| 83738 | 3/4/2014 | 20:32:47 | Outgoing | 202-460-9800 | I've got 22 x 100 |
| 83739 | 3/4/2014 | 20:32:56 | Incoming | 202-460-9800 | How bout I give you 1, and you replace it when you go down |
| 83740 | 3/4/2014 | 20:33:24 | Outgoing | 202-460-9800 | Ok.  I can do that. |
| 83741 | 3/4/2014 | 20:33:55 | Outgoing | 202-460-9800 | Any chance I could get it tonight? |
| 83742 | 3/4/2014 | 20:34:04 | Incoming | 202-460-9800 | Sure |
| 83743 | 3/4/2014 | 20:34:08 | Incoming | 202-460-9800 | When works for you? |
| 83744 | 3/4/2014 | 20:34:38 | Outgoing | 202-460-9800 | Ok.  Probably be about 9 pm |
| 83747 | 3/4/2014 | 20:35:52 | Incoming | 202-460-9800 | Ok |

| MESSAGE ID | DATE | TIME | DIRECTION | NUMBER | MESSAGE |
|---|---|---|---|---|---|
| 83750 | 3/4/2014 | 20:36:18 | Outgoing | 202-460-9800 | Ok. Cool.  Thank you |
| 83752 | 3/4/2014 | 20:36:16 | Incoming | 202-460-9800 | No problem |
| 83794 | 3/4/2014 | 21:31:23 | Outgoing | 202-460-9800 | I am on the road. |
| 83795 | 3/4/2014 | 21:31:42 | Incoming | 202-460-9800 | Ok |
| 83797 | 3/4/2014 | 22:07:26 | Outgoing | 202-460-9800 | In DC. At 1st and Mass. Ave. |
| 83798 | 3/4/2014 | 22:07:39 | Incoming | 202-460-9800 | Ok cool |
| 83808 | 3/4/2014 | 22:17:31 | Outgoing | 202-460-9800 | I'm here. |
| 83809 | 3/4/2014 | 22:16:32 | Incoming | 202-460-9800 | Me too |
| 84186 | 3/5/2014 | 18:25:19 | Outgoing | 202-460-9800 | Hey there was going to drop by this evening around 9:30 10:00 ish is that cool will update you when closer |
| 84187 | 3/5/2014 | 18:34:21 | Incoming | 202-460-9800 | Ok cool |
| 84227 | 3/5/2014 | 22:12:54 | Outgoing | 202-460-9800 | Looks like about 1030 sorry |
| 84228 | 3/5/2014 | 22:13:52 | Incoming | 202-460-9800 | That's ok, no worries |
| 84247 | 3/5/2014 | 23:31:21 | Outgoing | 202-460-9800 | I'm here. |
| 84248 | 3/5/2014 | 23:31:12 | Incoming | 202-460-9800 | Ok |

18.     As listed in the above table of iMessages, on March 2, 2014, after **WARREN** returned from Georgia, **HAMILTON** wrote: "That's cool, I'm not happy with the last batch, neither were my people, didn't even go through 1.  Had to get my bud from NY to bring me down one."  **WARREN** responded "Really?  I haven't had any issues" "I'm sorry.  Did you talk to Todd?" Agents believe that **HAMILTON** was not satisfied with the methamphetamine received and **WARREN** asked **HAMILITON** if he had contacted the source of supply, "Todd" regarding the methamphetamine quality.  Through historical iMessages exchanged between **WARREN** and **HAMILTON**, cell site records, and through conversations **WARREN** had other people, agents were able to deduce times and dates **WARREN** traveled to Washington, D.C.  On March 5, 2014, at approximately 10:34 PM, special agents observed **WARREN** arrive at the

**TARGET LOCATION** in a silver Chevy Captiva, bearing Maryland license plates 7BC6069[3], carrying a black bag.  Special agents observed **WARREN** exit the **TARGET LOCATION**, carrying a black bag at 10:46 p.m.

19.    On March 10, 2014, prior to **WARREN** traveling to Georgia, **WARREN** coordinated to meet and pick up money from **HAMILTON** in Washington, DC.  Through conversations with other people, special agents were able to deduce that **WARREN** was traveling to Washington, D.C.  On the same date, agents established surveillance in the area of the **TARGET LOCATION,** and observed **WARREN** enter the **TARGET LOCATION** carrying a black bag.

20.    On March 20, 2014, at approximately 11:50 a.m., special agents and task force officers established surveillance in the area of **WARREN**'s residence and observed a grey Acura in the area of **WARREN**'s residence.  At approximately 12:23 p.m., **WARREN** received an incoming call (call # 4538) from SHYMANSKY at (240) 299-8927.  The following is an excerpt from their conversation:

| | |
|---|---|
| WARREN: | "Hello." |
| SHYMANSKY: | "Hey Ron. You want to meet me right at my bank? I wasn't thinking about that. I have to go the bank, go by there and get some money. So, you want to just meet me right there. You know the one...." |
| WARREN: | "The one over by...." |

---

[3]    As stated previously, Enterprise Rent-A-Car responded to an administrative subpoena which identified the renter of this vehicle between March 4, 2014 through March 6, 2014 as Ron WARREN at 6179 Red Fox Place, Waldorf, Maryland.

| | |
|---|---|
| SHYMANSKY: | "Yeah, the one that I met you up before." |
| WARREN: | "Yeah, that's fine." |
| SHYMANSKY: | "You know." |
| WARREN: | "Yep. I'll meet you over there." |

During the conversation, **WARREN** agreed to meet SHYMANSKY near her bank ("my bank"). At approximately 12:37 p.m., special agents observed the grey Acura, bearing Maryland license plates MVH714 depart the area of **WARREN**'s residence. Agents maintained surveillance on the grey Acura and at approximately 12:43 p.m., special agents observed the Acura parked next to a red Ford Truck, bearing Tennessee license plates F7443Z, at the County First Bank located at 3670 Old Washington Road, Waldorf, MD. The Tennessee Department of Motor Vehicles identified the registered owner of the vehicle as Caroline SHYMANSKY and James TAYMAN, at 814 Allen P Deakins Road, Pikesville, Tennessee.

21. Special agents observed **WARREN** exit the grey Acura and walk toward the driver's window of the red Ford Truck. Special agents then observed a hand-to-hand exchange between **WARREN** and the driver of the red Ford Truck, and then observed **WARREN** walk back to the Acura holding a white envelope. Special agents observed the red Ford Truck depart the area of the County First Bank and maintained surveillance of the vehicle until 12:57 p.m., when the Charles County Sheriff's Department ("CCSD") executed a traffic stop of the red Ford Truck for a vehicle equipment violation. The driver of the vehicle was identified as Caroline SHYMANSKY. CCSD was familiar with SHYMANSKY's criminal history of narcotics violations and deployed a narcotics dog which alerted to the presence of narcotics in SHYMANSKY's vehicle. A search of SHYMANSKY's vehicle recovered a white envelope

14

containing approximately 3.5 grams of suspected methamphetamine, which was found inside SHYMANSKY's purse.  CCSD detectives also found a purple change purse containing several small zip-lock baggies.

22.   On March 26, 2014, special agents established surveillance outside and inside the **TARGET LOCATION**.  Special agents observed **WARREN** exit the rear passenger door of a gold Chevy Tahoe, and then to the front of the **TARGET LOCATION**, carrying a black bag. Your affiant observed **WARREN** and **HAMILTON** walk down the hallway of the 2nd floor and then observed **WARREN** and **HAMILTON** enter the **TARGET LOCATION**.

23.   Your affiant served the management company with an administrative subpoena for video recordings and other information regarding the **TARGET LOCATION**.  A review of available recordings for the month of March revealed **WARREN** at the **TARGET LOCATION** on at least five (5) occasions between March 16, 2014 and March 26, 2014.  All of **WARREN's** visits with **HAMILITON** occurred before and after trips to Georgia to meet with **ALLEN** for the purchase of methamphetamine.

24.   On April 1, 2014, approximately 11:25 p.m., **WARREN** utilizing Target Telephone #1, received an incoming phone call (call #6120) from ALLEN at (678) 914-1012. The following is a transcript of their call:

WARREN:          "Hello."

ALLEN:            "What room number are you in?"

WARREN:          "We're in the North tower the 23rd floor, 2352."

ALLEN:            "2352."

WARREN:          "If you can't get up, let me know."

ALLEN:              "Okay, 2352."

WARREN:             "2352."

ALLEN:              "Alright, and how much money did you bring?"

WARREN:             "I'm sorry?"

ALLEN:              "How much did you bring?"

WARREN:             "Um, 7150. That's five and one half."

ALLEN:              "Five and a half, ok. 2352, okie dokie. Alright, I'll be over

 there in a minute."

WARREN:             "Okay."

ALLEN:              "How much, seventy what?"

WARREN:             "7150."

ALLEN:              "Okay, cool. Alright I'll see you in a minute."

WARREN:             "Okay, bye."

Based on the above phone call, and cell site records, your affiant believes that **WARREN** was in Atlanta, Georgia at the Sheraton Hotel in Room 2352; "We're in the North tower the 23rd floor, 2352."  Your affiant believes during the conversation when ALLEN asked **WARREN** "Alright, and how much money did you bring?" and **WARREN** responded that he had 7150, this meant $7,150. When WARREN responded "five and one half," he was referring to the planned purchase of five and a half (5.5) ounces of methamphetamine; "Um, 7150. That's five and one half."

25.     On April 7, 2014, ALLEN sent a text message (call #6576) to **WARREN** "When do you think?" to which **WARREN** responded in two texts messages (call #6577) "Tomorrow."

On April 8, 2014, **WARREN** sent a text message (call #6635) to ALLEN to indicate what time he would be arriving in Georgia "9:30pm".  ALLEN responded "Qty.??" to which **WARREN** responded "About 6".  Your affiant believes based on training and experience that **WARREN** advised ALLEN that he would be arriving in Georgia at 9:30pm and need six (6) ounces of methamphetamine from ALLEN.  Your affiant knows through cell site records that **WARREN** traveled to Atlanta, Georgia on April 8, 2014.

26.     On April 13, 2014, your affiant received historical iMessages pertaining to Target Account #1.  The following iMessage conversations with **HAMILTON** at (202) 460-9800, were stored by **WARREN** at Target Account #1:

| APPLE MESSAGE ID | DATE | FROM | MESSAGE |
|---|---|---|---|
| 90189 | 4/7/2014 | WARREN | Hey |
| 90241 | 4/7/2014 | WARREN | How's it going ? |
| 90243 | 4/7/2014 | HAMILTON | Just woke up |
| 90244 | 4/7/2014 | HAMILTON | How are ya? |
| 90245 | 4/7/2014 | WARREN | Good thanks.  Doing my thing tomorrow.  Should I come see you tonight ? |
| 90246 | 4/7/2014 | HAMILTON | Sure |
| 90247 | 4/7/2014 | WARREN | Ok.  Prolly around 9 |
| 90248 | 4/7/2014 | HAMILTON | Ok |
| 90266 | 4/7/2014 | HAMILTON | Still on for 9? |
| 90267 | 4/7/2014 | WARREN | Looks like 9:15.  Do I need to come up or? |
| 90268 | 4/7/2014 | HAMILTON | Yeah, I need you to pop upstairs for a sec |
| 90269 | 4/7/2014 | WARREN | Ok. |
| 90270 | 4/7/2014 | WARREN | Here |
| 90466 | 4/9/2014 | HAMILTON | Hi |
| 90465 | 4/9/2014 | WARREN | Hey |
| 90467 | 4/9/2014 | WARREN | Back.  Exhausted. |
| 90468 | 4/9/2014 | WARREN | I can have someone drive me up shortly. |
| 90469 | 4/9/2014 | HAMILTON | Ok cool, take a quick nap. :-) |
| 90473 | 4/9/2014 | HAMILTON | Ok |

| APPLE MESSAGE ID | DATE | FROM | MESSAGE |
|---|---|---|---|
| 90472 | 4/9/2014 | WARREN | On way. |
| 90474 | 4/9/2014 | WARREN | Almost there |
| 90475 | 4/9/2014 | HAMILTON | Ok |

27.     Based on the above conversations, cell site records and through training and experience, your affiant believes that **WARREN** went to the **TARGET LOCATION** on April 7, 2014 to collect money for the purchase of methamphetamine.  Your affiant knows through cell site records and conversations **WARREN** had with ALLEN that **WARREN** then traveled to Georgia on April 8, 2014 and returned to the Washington D.C. metropolitan area on April 9, 2014.   On the same date **WARREN** returned home, **WARREN** went to **HAMILTON's** residence at the **TARGET LOCATION** to drop off the methamphetamine received from ALLEN.

28.     On April 14, 2014, at approximately 10:42 p.m., **WARREN**, utilizing Target Telephone #1, sent an outgoing text message (call #7212) to ALLEN which stated "I m leaving in the morning".  Your affiant knows based on training and experience that **WARREN** advised ALLEN he would be leaving Maryland in the morning (April 15, 2014) and traveling to Georgia to pick up methamphetamine.   At approximately 11:14 p.m. **WARREN**, utilizing Target Telephone #1, received an incoming phone call (call #7214) from ALLEN.  The following is a transcript of their call:

WARREN:      "Hello, hello?"

ALLEN:      "Hey Ron how you doing."

WARREN:      "I'm fine how are you?"

ALLEN:      "Doing good, doing good, you okay?"

18

WARREN:     "Yeah, doing, okay."

ALLEN:      "I hope I did not call at a bad time."

WARREN:     "I'm sorry."

ALLEN:      "I said, I hope I did not call at a bad time."

WARREN:     "No, no not at all."

ALLEN:      "I wanted to let you know that if you want to tell Greg that I think I got two of those replaced."

WARREN:     "Okay."

ALLEN:      (inaudible)..."let him know that."

WARREN:     "So, okay."

ALLEN:      "Actually don't, don't tell him anything, don't tell him anything see what he does. I want to see what he does."

WARREN:     "Okay."

ALLEN:      "But umm, but, but (inaudible) you will take care of it for him, I think I got two of them replaced for him."

WARREN:     "Okay, cool."

ALLEN:      "Okie dokie."

WARREN:     "Alright."

ALLEN:      "Alright you have a safe trip and I'll talk to you tomorrow."

WARREN:     "Alright sounds good."

ALLEN:      "Thank you for the heads up, by the way I appreciate it."

WARREN:     "Hey, no problem."

ALLEN:          "Alright, good night Ron."

WARREN:          "Alright, bye, bye."

Based on training and experience, your affiant believes that **ALLEN** called **WARREN** to let him know that he has two ounces of methamphetamine for Gregory **HAMILTON**, which are replacements for two ounces of methamphetamine that **HAMILTON** received that were of poor quality ("I wanted to let you know that if you want to tell Greg that I think I got two of those replaced.")

29.     On April 15, 2014 **WARREN**, utilizing Target Telephone #1, exchanged the following text messages with ALLEN:

| CALL # | FROM | MESSAGE |
|--------|------|---------|
| 7250 | WARREN | 8:30 pm. No boys. Not planning on 4.5 staying. Thanks. |
| 7252 | ALLEN | Thank you sir . You OK Ron ? I ve got you ready there won t be any delay. |
| 7254 | WARREN | Ok. Thank you. Yes everything ok. Just a lot going on. Thanks again. :) |

Based on the above text messages, your affiant believes that **WARREN** told **ALLEN** that he would be traveling alone, needed 4.5 ounces of methamphetamine and would arrive in Georgia around 8:30 p.m. and intended on leaving right away ("8:30 pm. No boys. Not planning on 4.5 staying. Thanks.").   ALLEN advised **WARREN** that he has the methamphetamine ready for **WARREN** and that there will be no delay ("Thank you sir . You OK Ron ? I ve got you ready there won t be any delay.").  Based on cell site information and surveillance conducted by agents in Georgia, your affiant knows that on the evening of April 15, 2014, **WARREN** was in Atlanta, Georgia and met with ALLEN.

20

30.    **Gregory HAMILTON**, a white male, 5'7", 150 lbs., with a date of birth April 12, 1983 and is known to reside at the **TARGET LOCATION**.   **HAMILTON's** criminal history includes an arrest on September 2, 2013 for possession of Schedule I or II drugs and Schedule IV drugs.   **HAMILTON** is currently wanted by the Fairfax County (Virginia) Police (date of warrant: December 10, 2013).

31.    Based on the investigation, I know that the **TARGET LOCATION** is used by **Gregory HAMILTON** as a primary residence.   In particular, information provided by the management company for the **TARGET LOCATION** stated that **HAMILTON** has access to the apartment at any time.   Additionally, video surveillance footage shows **HAMILTON** at the **TARGET LOCATION** awaiting WARREN's arrival.   Your affiant has also received information from the United States Marshals Service and the Arlington County Police Department advising that their confidential sources have stated that **HAMILTON** resides at the **TARGET LOCATION**.   **HAMILTON** operates independently of **WARREN**, but is supplied with methamphetamine by **WARREN** and other sources in the Washington, D.C. area. **HAMILTON** provides **WARREN** with money, which is transported by **WARREN** to Georgia for the purchase of methamphetamine from **ALLEN**. Upon **WARREN's** return, **WARREN** supplies **HAMILTON** with methamphetamine.    **HAMILTON** in turn distributes methamphetamine to multiple customers in Washington D.C. and Virginia.   As explained previously, **HAMILTON** continues to provide money to **WARREN** for the purchase of methamphetamine.  Based on the numerous intercepts of **HAMILTON**, as well as my general knowledge of narcotics dealers, your affiant believes that documents, including ledgers, records and notes reflecting narcotics transactions, are located in the **TARGET LOCATION**.

## DESCRIPTION OF TARGET LOCATION

32.     The **TARGET LOCATION** is a multi-level, multi-unit apartment building constructed of tan brick located on S Street, in the Northwest quadrant of Washington, D.C.  The front entrance to the building is a glass door with brown trim.  Above the door is a window which displays the numbers "1401" in white lettering.  There is another glass door after the front door, and a staircase on the left of the concierge's desk which leads to the second floor.  Apartment 214 is located at the very end of the hallway on the left side of the second floor.  The door is tan in color with a silver peep hole and silver lock and handle.  The numbers "214" are etched in a metal plate next to the door with a small light pointing at the numerals.

## REQUEST FOR NIGHTTIME EXECUTION AUTHORITY

33.     Your affiant further requests authority to execute this warrant at any time in the day or night.  During the course of this investigation, the DEA has learned that **WARREN** and **HAMILTON** have conducted transactions at the **TARGET LOCATION** after 10 p.m. and before 6 a.m.  Therefore, the DEA anticipates that the search of the **TARGET LOCATION**, outside the hours of 6 a.m. and 10 p.m., is likely to yield success.

## <u>CONCLUSION</u>

34.     Based on the foregoing I submit that there is probable cause to believe that the Target Subjects and other individuals, known and unknown, conspired to distribute and possess with intent to distribute controlled substances, and to commit the other Target Offenses outlined above.  Furthermore, there is probable cause to believe that evidence and instrumentalities of the crimes described herein and as set forth more fully in Attachment A, incorporated herein by reference, is contained or secreted within the confines of the **TARGET LOCATION**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


_____
Jonathon Price
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me this _____ day of April, 2014.


_____
Deborah A. Robinson
United States Magistrate Judge
for the District of Columbia